

Colin Prince
Chief Appellate Attorney
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for Alex Mischenko

# United States District Court
Honorable Rosanna M. Peterson

| | |
|---|---|
| United States, | No. 20-cr-175-RMP |
| Plaintiff, | Sentencing Memorandum |
| v. | |
| Alex Mischenko, | |
| Defendant. | |

## I.  Introduction

Alex Mischenko respectfully requests a sentence of three-years probation without home confinement, no financial penalties, and asks that the Court impose the probation conditions listed in the plea agreement.[1] Mr. Mischenko's case presents numerous mitigating circumstances warranting a probationary sentence:

| Variance Grounds ||
| --- | --- |
| **Factor** | **Basis for Downward Variance** |
| Mr. Mischenko's history and characteristics | - Age<br>- Lack of significant criminal history<br>- Honorably discharged veteran<br>- Substantial history of traumatic brain injury and decreased mental capability<br>- Declining physical health<br>- Poverty<br>- Lifelong history of employment |
| Nature of the offense | - Lack of discernible motive<br>- Personally performed the asbestos removal<br>- Hansen property was widely contaminated with industrial waste before Mr. Mischenko's conduct |
| Just punishment | - Three years of probation subjects Mr. Mischenko to significant restrictions<br>- Felony conviction imposes thousands of collateral effects |
| Deterrence and incapacitation | - No general deterrent effect is achieved through harsh sentence<br>- No specific deterrent effect is necessary because Mr. Mischenko no longer works |

---

[1] *See* ECF No. 62 at 11–12.

## II. Discussion

At sentencing, courts should impose only what is necessary to achieve the Sentencing Reform Act's goals—and nothing more: "a substantively reasonable sentence is one that is 'sufficient, but not greater than necessary." *U.S. v. Ressam*, 679 F.3d 1069, 1089 (9th Cir. 2012) (quoting 18 U.S.C. § 3553(a) (emphasis added)). Although guideline ranges are relevant, courts "may **not** presume that the Guideline range is reasonable." *Gall v. U.S.*, 552 U.S. 38, 49–50 (2007). While considering guidelines, courts focus on the goals of sentencing: deterrence, retribution, incapacitation, and rehabilitation—the guidelines, as Justice Stevens, one of the original guideline authors, noted, are "truly advisory." *See* 18 U.S.C. § 3553(a)(1), (2)(A)–(D);[2] *see also Rita v. U.S.*, 551 U.S. 338, 366 (2007) (Stevens, J., concurring). Courts are "free to make [their] own reasonable application of the § 3553(a) factors, and to **reject** (after due consideration) the advice of the Guidelines"—which should not have "any thumb on the scales." *Kimbrough v. U.S.*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring) (emphasis added).

---

[2] "Deterrence, incapacitation, and rehabilitation are prospective and societal—each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?" *U.S. v. Cole*, 2008 WL 5204441, at *4 (N. D. Ohio Dec. 11, 2008).

Sentencing Memo
– 2 –

When fashioning a sentence, courts should keep in mind "the importance of interrogating the Guidelines," because any such "comprehensive and detailed system . . . necessarily includes some arbitrary rules and cutoffs." *Bridges v. United States*, 991 F.3d 793, 809 (7th Cir. 2021).

**A.    The Court should impose three years of probation.**

Alex Mischenko believes a three-year probation sentence satisfies the Sentencing Reform Act's goals: retribution,[3] deterrence,[4] public safety,[5] and rehabilitation.[6] That is true for four reasons:

*First*, it appears Mr. Mischenko's mental capacity is deteriorating due to past severe brain trauma and age, and his declining cognitive state likely contributed to the offense. In interviews with an FDO investigator, both Mr. Mischenko's children speculated that the origins of this case lie in a severe car accident in the late 1960s. According to Mr. Mischenko's daughter, Stacy Ogden, Alex was hit by two drunk teens, both of whom were killed.[7] The accident thrust Alex's forehead into the

---

[3] Commonly referred to as the "retribution" factor, the Sentencing Reform Act requires courts to consider the "seriousness of the offense," the need to "promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A).

[4] The Sentencing Reform Act requires that courts impose sentences that are sufficient, but no more than necessary, to "deter[] . . . criminal conduct." 18 U.S.C. § 3553(1), (2)(B).

[5] The Sentencing Reform Act requires courts to impose a sentence "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

[6] The Sentencing Reform Act asks courts to consider "needed educational or vocational training, medical care, or other correctional treatment" in imposing sentence. 18 U.S.C. § 3553(a)(2)(D).

[7] This information was provided by Ms. Ogden during an interview with FDO Mitigation

Sentencing Memo
– 3 –

gearshift, which punched through his skull. Ms. Ogden relayed that her father apparently died multiple times during surgery and was revived; he then received a metal plate in his forehead and then was placed in an eight-month medically-induced coma. Ms. Ogden further stated that the family had been told the injuries would likely affect his decision-making and reasoning (given that it was a direct injury to the frontal lobe).

At the time of the accident, Ms. Ogden was a young child, but her mother told her the information above. There is good reason to believe it credible: Alex's son, Donnie Mischenko, gave a nearly identical account. According to Donnie,[8] his father was so severely injured that he had to relearn to eat. Donnie stated that after the accident, Alex wasn't able to be much of a father, and Donnie was largely raised by his grandparents. Stacy noted that the head injury had been raised in Alex's divorce proceedings when litigating parental rights, suggesting her mother believed the head injury undercut Alex's ability to function as a parent.

Both Donnie and Stacy described similar problems with Alex's reasoning. Donnie opined that Alex fails to think through actions, and when they make a plan, Alex will need to re-evaluate it over and again, much to Donnie's frustration.

---

Specialist Brenda Challinor on June 14, 2023.

[8] This information was provided by Donnie Mischenko during an interview with FDO Mitigation Specialist Brenda Challinor on June 12, 2023.

Interestingly, both Stacy and Donnie—interviewed separately—gave nearly identical statements: Alex's reasoning was unsound when he was under stress.

Donnie believes that for the last few years Alex appears to be showing increasing signs of dementia—mood swings and forgetfulness. During her interview, Stacy initially disagreed about dementia but then noted several times that Alex seemed quite forgetful.

A peculiar fact is worth raising: Mr. Mischenko himself was not forthcoming about the traumatic brain injury and has not acknowledged any deficits arising from it. Indeed, in the PSR, Mr. Mischenko barely mentioned the accident and never mentioned any injuries, saying only that he had an old scar on his forehead from an accident in 1966.[9] He otherwise described himself as "in good health,"[10] which is questionable. Stacy reported that, four years ago, Alex fell on a wood pile and broke his back in three places, leading to a blood infection, rehab through the VA, and a significant period in a wheelchair. And she described her father as "not sure-footed" and does not believe he can work anymore. (He hasn't worked since the offense.)[11]

---

[9] *See* PSR ¶ 65

[10] PSR ¶ 66.

[11] PSR ¶ 74.

In part because of those concerns, Alex lives with Stacy's daughter, Shayla and her four children (aged 2, 6, 8, and 10), which Stacy says makes her feel better that someone is watching him.

Apart from the difficulties described above, Stacy described her father as "generous and well-meaning."

The above description of Mr. Mischenko's mental capacity isn't meant to generate sympathy—his traumatic-brain injury almost certainly played a central role in the offense. Indeed, there was no particular reason for Mr. Mischenko to disturb the asbestos or fail to obtain the necessary permit. He had little financial motive. The property owner, Hansen Industries, would have paid all the necessary fees and paid for a professional abatement. Mr. Mischenko charged a fee for his work but it was minimal. And he wasn't profiting off the back of exposed workers; Mr. Mischenko and his own grandson were the ones actually moving the asbestos. Nor was Mr. Mischenko facing some sort of tight renovation schedule that might be dodged by cutting corners. In short, there isn't much of a motive or even logic to his conduct. The best explanation is that it was poor decision-making by a man suffering decreasing mental capacity.

***Second***, the nature of the property made it easy for Mr. Mischenko to rationalize his conduct. The Hansen property is an industrial wasteland littered with chemical barrels and other asbestos. This is Building No. 5, where Mr. Mischenko removed the asbestos:



This is the building next to it:



The facility is covered in overturned chemical barrels and industrial debris:





The next building over is where Mr. Mischenko moved the asbestos once it was stored in sacks. That building has pipes covered in damaged pipe-wrap:



The rest of the Hansen property contains various rundown buildings, piles of industrial waste and contaminants, and all manner of detritus. The point is this: when standing at the Hansen facility, it is easy to see why someone like Mr. Mischenko might rationalize moving the pipe wrap in Building No. 5 and think it wasn't impactful.

*Third*, imposing a home-confinement sentence serves no deterrent benefit. As for general deterrence—i.e., the idea of sentencing Mr. Mischenko to a harsher penalty to deter others—it does not work. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Justice 1, 28–29 (2006) (citing articles published in 1980, 1998, 1999, and 2003). Certainty of getting caught deters crimes; severity of punishments

does not.¹² And even if it worked, general deterrence is immoral. *See* Immanuel Kant, *The Science of Right* 195 (1790) ("[I]n all cases," punishment must "be imposed only because the individual on whom it is inflicted has committed a crime," not "merely as a means subservient to the purpose of another.").

Even DOJ's own research agrees. The idea that increasing penalties somehow deters others is largely a myth, as the National Institute of Justice, an arm of DOJ, says: "[s]ending an individual convicted of crime to prison isn't a very effective way to deter crime."¹³ What deters crime is the "*certainty* of being caught," not the harshness of punishment: "Research shows *clearly* that the chance of being caught is a vastly more effective deterrent than even draconian punishment."¹⁴

---

¹² "No one doubts that having a system of punishment has crime-preventive effects. The important question is whether changes in punishments have ***marginal deterrent effects***, that is, whether a new policy causes crime rates to fall from whatever level they would otherwise have been at." But "[i]maginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Sciences panels, all appointed by Republican presidents, reached that conclusion," as "has ***every*** major survey of the evidence." *Tonry*, 34 Crime & Justice at 28–29 (internal citations omitted and emphasis added).

¹³ Nat'l Instit. of Just., *Five Things About Deterrence* (June 5, 2016) (available at: https://bit.ly/2XA9g2s).

¹⁴ *Id.* (emphasis added). Adding to the NIJ's conclusion is proof from the Sentencing Commission, which just released a compelling study proving that longer sentences deter nothing. In July 2020, the commission published a lengthy study comparing two groups: (1) offenders released on average three-years early under the drugs-minus-two guideline amendment; and (2) offenders who would have been eligible but completed their entire sentences before the amendment. U.S. Sentencing Commission, *Retroactivity & Recidivism: The Drugs Minus Two Amendment* (July 2020) (available at: https://bit.ly/3e62vN0). The verdict: longer sentences have no deterrent effect. "There was ***no statistically significant difference*** in the recidivism rates" between the groups—in fact, the early-release group actually had a slightly lower recidivism rate.

Mr. Mischenko was caught. That deters crime. But sentencing him to home confinement or imposing a fine achieves no greater purpose.

Although research confirms that conclusion, research isn't needed to see that it is common sense. Mr. Mischenko's case isn't going to make the front page of the New York Times or even the Spokesman Review. The ultimate sentence will not be deeply considered by contractors who might be weighing a potential asbestos violation.

As for specific deterrence, i.e., the need to ensure Mr. Mischenko violates no further asbestos regulations, that hardly seems necessary given that he is 75-years old and hasn't worked since this incident. And the parties have agreed to a probation condition barring further asbestos work.

*Fourth*, the Government cites a number of other asbestos-related cases in its discussion of disparity. While laudable, the information provided isn't enough for comparison. Were those cases where the existing site was littered with other chemicals? Were the failures profit driven? Were the defendants suffering from mental issues? We know little of the facts, the mitigating or aggravating circumstances, and they are not useful for comparison.

### B.     The Court should impose no financial penalties.

The Defense recommends no financial penalties. As a purely factual matter, any financial penalties are unlikely to be fully paid. Mr. Mischenko is poor. He lives in a rundown home in the rural Idaho woods up a lengthy dirt road. The house is dirty, with

plywood on the walls, little furniture, and is strewn with personal belongings in various states of disrepair. A financial penalty will simply take a small amount of Mr. Mischenko's income. And there is little to spare. As the PSR notes, he has $980 in monthly retirement benefits and about $600 in expenses.[15] His total savings was approximately $1,000 at the time of the interview. Nothing would be achieved by punitively taxing Mr. Mischenko's remaining $380 per month or his meager savings. It would just make his life a little bit harder with no commensurate benefit to the public.

This isn't lost on Hansen. The company withdrew its restitution request because it understood Mr. Mischenko's financial situation and commendably chose not to add to his distress.

### III. Conclusion

For the reasons stated above, Mr. Mischenko requests a term of three-years of probation without home confinement but including the additional probation conditions listed in the plea agreement.[16]

---

[15] PSR ¶ 82.

[16] *See* ECF No. 62 at 11–12.

Dated: June 20, 2023.

        Federal Defenders of Eastern Washington & Idaho
        Attorneys for Alex Mischenko

        s/Colin G. Prince
        Colin G. Prince, WSBA No. 43166
        10 North Post Street, Suite 700
        Spokane, Washington 99201
        t: (509) 624-7606
        f: (509) 747-3539
        Colin_Prince@fd.org

### Service Certificate

I certify that on June 20, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorneys: Dan Fruchter, Tyler Tournabene, Gwen Russell, Karla Perrin.

        s/Colin G. Prince
        Colin G. Prince, WSBA No. 43166
        10 North Post Street, Suite 700
        Spokane, Washington 99201
        t: (509) 624-7606
        f: (509) 747-3539
        Colin_Prince@fd.org